**FILED**

J N   AUG 2 2 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Delisa Ross | ) | |
| | ) | |
| Plaintiff, | ) | 04 C 6557 |
| | ) | |
| v. | ) | |
| | ) | |
| RJM Acquisitions Funding, LLC, a | ) | Magistrate Geraldine Soat Brown |
| Delaware limited liability company, | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF FILING**

TO:   David Philipps
        Gomolinski & Philipps
        8855 S. Roberts Road
        Hickory Hills, IL  60457

PLEASE TAKE NOTICE that on <u>August 22, 2005</u>, we filed Defendant's Amended Response to Plaintiff's Local Rule 56.1 Statement of Material Facts & Defendant's Amended Response to Plaintiff's Motion for Summary Judgment.

By: _Maria L. Whiteman_
        Attorney for Defendant

**CERTIFICATE OF SERVICE BY MAIL**

I, <u>Jodi A. Holmes</u>, a nonattorney, after being first duly sworn, on oath state that I caused a true and correct copy of the attached document to be deposited in the U.S. Mail at 166 W. Washington, Suite 300, Chicago, Illinois on August 22, 2005, on or before the hour of 5:00 p.m., in an envelope with first class postage prepaid and addressed to the named person in this Notice.

_Jodi A. Holmes_

Maria L. Whiteman
Joseph Messer
Messer & Stilp, Ltd.
166 W. Washington, Suite 300
Chicago, IL  60602
(312) 334-3476



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

J.N **FILED**

AUG 2 2 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Delisa Ross, )
)
   Plaintiff, )
)
v. )   No. 04 C 6557
)
RJM Acquisitions Funding, L.L.C., a )   Judge Gottschall
Delaware limited liability company, )   Magistrate Judge Brown
)
   Defendant. )

## DEFENDANT'S AMENDED RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Defendant, RJM Acquisitions Funding LLC ("RJM"), states as its amended

response to Plaintiff's Local Rule 56.1 Statement of Material Facts as follows:

1.    The jurisdiction of the Court is invoked as authorized by §1692k(d) of the

FDCPA and 28 USC § 1331. (Complaint and Answer at 1).

**ANSWER:**   Admit.

2.    Venue is proper in this District because the acts and transactions occurred

here, Plaintiff resides here, and Defendant transacts business here. (Complaint and

Answer at 2).

**ANSWER:**   Admit.

3.    Plaintiff, Delisa Ross ("Ross"), is a citizen of the State of Illinois, residing

in the Northern District of Illinois, from whom Defendant attempted to collect a

consumer debt, allegedly owed to Defendant, and originally owed to Fingerhut, for

consumer goods. (Complaint and Answer at 3; Affidavit of Delisa Ross, attached hereto

as Exhibit A ("Ross Aff.") at 1, 5).

**ANSWER:**   Upon information and belief RJM admits that the Plaintiff is a

citizen of the State of Illinois, residing in the Northern District of Illinois. Answering

further, RJM denies that it was attempting to collect a consumer debt allegedly owed by

Delisa Ross to RJM, and originally owed to Fingerhut, for consumer goods. RJM was

attempting to collect a debt from Lisa Ross, not Delisa Ross. (*See* Exhibit B attached to

Plaintiff Statement of Material Facts). Additionally, Plaintiff has denied using the name

Lisa Ross to obtain goods from Fingerhut. (*See* Counsel for Plaintiff's Letter dated

February 21, 2005 attached to RJM's Motion for Summary Judgment as Exhibit H; *see*

*also* Ross Aff. Attached to Plaintiff's Statement of Material Facts as Exhibit A).

    4.    Defendant, RJM Acquisitions Funding, LLC ("RJM") is a Delaware
limited liability company which acts as a debt collector, as defined by § 1692a of the
FDCPA, because it regularly uses the mails to collect, or attempt to collect, directly or
indirectly consumer debts, in the Northern District of Illinois. (Complaint and Answer at
4).

    **ANSWER:**   Admit.

    5.    Delisa Ross filed a voluntary Chapter 7 petition in bankruptcy on June 20,
2003, styled, *In re Ross*, N.D. Ill. Bankr. No. 03 B 26666, listing her address as 305 East
77th Street, Chicago, IL 60619. (Complaint and Answer at 5; Ross Aff. At 3; excerpt of
Plaintiff's bankruptcy petition, attached as Ex. A to the Complaint).

    **ANSWER:**   Admit.

    6.    A consumer debt in the amount of $574.72 that Plaintiff Ross owed to
Fingerhut Credit Advantage on account No. 1739064439 was listed on Schedule F -
Creditors Holding Unsecured Nonpriority Claims" of Ms. Ross' bankruptcy petition.
(Complaint and Answer at 5; Ross Aff. At 3; and Ex. A to the Complaint).

    **ANSWER:** Admit. Answering further, Fingerhut Credit Advantage was listed

on Plaintiff's Schedule F as follows:

> Fingerhut Credit Advantage
> c/o Axsys National Bank
> P.O. Box 5033
> Sioux Falls, SD 57117-5033.

(*See* Exhibit A attached to Plaintiff's Complaint). However, Axsys National Bank did

not service account No. 1739064439. (*See* Complaint and Answer at 5; Ross Aff. At 3;

and Ex. A to the Complaint; and Matte Aff. at ¶ 12, attached as Exhibit 1 hereto).

2

7.      Notice of Plaintiff Ross' bankruptcy was sent to Fingerhut Credit Advantage, at P.O. Box 5033, Sioux Falls, South Dakota 57117-5033 via both first class mail, on June 26, 2003 and via electronic transfer on June 24, 2003.

**ANSWER:**   Deny.  Notice of Plaintiff Ross' bankruptcy was sent to Fingerhut Credit Advantage, c/o Axsys National Bank, P. O. Box 5033, Sioux Falls, South Dakota 57117-5033.  (*See* Ex. A attached to Plaintiff's Complaint).  Answering further, notice of Plaintiff's bankruptcy to the original creditor, Fingerhut Credit Advantage cannot be imputed to RJM.  See <u>Randolph v. IMBS, et al.</u>, 368 F.3d 726, 729(7th Cir. 2004).

8.      Notice of Plaintiff Ross' bankruptcy was sent to Plaza Associates at P. O. Box 18008, Hauppage, New York 11788-8808 via first class mail, on June 26, 2003. (Complaint at Exhibit B).

**ANSWER:**   RJM cannot admit or deny the allegations contained in Paragraph 8 of Plaintiff' Statement of Material Facts.  Answering further, Plaza has no record of receiving such notice.  Had Plaza received such notice, Plaza would have forwarded the notice to RJM.  (*See*, Matte Affidavit at ¶ 22).  Answering further, notice of Plaintiff's bankruptcy to the debt collector, Plaza, cannot be imputed to RJM.  *See* <u>Randolph v. IMBS, et al.</u>, 368 F.3d 726, 729(7th Cir. 2004).

9.      Prior to Plaintiff Ross' bankruptcy, Plaza Associates had attempted, on behalf of its client, RJM, to collect a debt in the amount of $574.72 on Fingerhut account 17389064439, by sending Ms. Ross at least one letter, dated May 5, 2003. (See attached Exhibit B).

**ANSWER:**   Admit.

10.     It is the business practice of Plaza Associates to forward any bankruptcy notices in [sic] receives on RJM accounts to RJM. (*See* Affidavit of Paul Brennan, at 8, attached as Exhibit C).

**ANSWER:**   Admit.  (*See also*, Matte Affidavit at ¶ 22).

11.     On October 17, 2003, Plaintiff Ross received a discharge from the bankruptcy court and notice was sent to Fingerhut and Plaza by the Court via first class mail on or about October 19, 2004. (Complaint and Answer at 7; Ross Aff. at 4; and, Discharge of Debtor, attached as Exhibit C to the Complaint).

**ANSWER:**    RJM cannot admit or deny the allegations contained in Paragraph

11 of Plaintiff' Statement of Material Facts. Answering further, had Plaza received such

notices, Plaza would have forwarded the notices to RJM. (*See*, Affidavit of Paul Brennan

attached as Exhibit C to Plaintiff' Statement of Material Facts[1]; *see also* Matte Affidavit ¶

22). Answering further, notice of Plaintiff's bankruptcy to the Plaza or Fingerhut cannot

be imputed to RJM. *See* Randolph v. IMBS, et al., 368 F.3d 726, 729(7th Cir. 2004).

12.     On June 15, 2004 and again on August 3, 2004, Defendant RJM sent Ross letters seeking to collect on the debt allegedly owed to RJM and demanded payment of the debt. (Complaint and Answer at 8; Ross Aff. at 6; Defendant RJM's collection letters to Plaintiff, attached as Exhibits D and E to the Complaint).

**ANSWER:**    Admit.

13.     At the time it attempted to collect the Fingerhut debt from Plaintiff Ross, Defendant RJM had no adequate procedures in place to determine whether it had received notice that a consumer had filed and/or been discharged in a bankruptcy proceeding, nor did Defendant RJM have any agreement with Fingerhut or Plaza Associates, informal or formal, that Fingerhut or Plaza would inform RJM of any bankruptcy notices it received. (Def.'s Required Disclosures Pursuant to Rule 26(a)(1) at subpart (a) and (b), attached as Exhibit D).

**ANSWER:**    Deny. Answering further, at the time RJM attempted to collect a

Fingerhut debt from Lisa Ross, RJM had adequate procedures in place to determine

whether it had received notice that a consumer had filed and/or been discharged in a

bankruptcy proceeding. (*See* Matte Affidavit at ¶¶ 6-11). First, RJM had an agreement

with the original creditor – Federated Department Stores ("FDS") - that FDS would not

forward accounts that had been discharged in bankruptcy. (*See* Matte Affidavit at ¶ 7).

---

[1] RJM is merely citing to the fact that the Affidavit of Paul Brennan is attached to Plaintiff's Motion for Summary Judgment.

FDS agreed that it if it became aware of any future claims that would affect RJM, it would notify RJM. (*See,* section 9 of the Agreement attached to Plaintiff' Statement of Material Facts as Exhibit L; *see also* Matte Affidavit at ¶ 9). Specifically, FDS is required to immediately notify RJM "...of any claim or threatened claim that may affect [FDS] or [RJM] ... that is discovered by them." (Id.)   RJM maintained reasonable procedures with Plaza Associates, the collection agency it engaged to collect Plaintiff's account (the "Account"), to forward a copy of all bankruptcy notices that Plaza receives to RJM. (*See* Matte Affidavit at ¶ 10.)   RJM also caused a bankruptcy search to be conducted before collecting on the Account. (*See* Affidavit of Todd Feige attached to Plaintiff's Statement of Material Facts as Exhibit I; *see also* Matte Affidavit at ¶ 11).

14.   In its Required Disclosures Pursuant to Rule 26(a)(1), dated January 11, 2005, Defendant listed five individuals likely to have discoverable information that Defendant would use to support its claims or defenses, but did not identify the subject of information for each. (*See,* Exhibit D).

**ANSWER:**   Admit. Answering further, Defendant supplemented the Rule 26(a)(1) disclosures with Responses to Plaintiff's First Set of Interrogatories on January 27, 2005 and supplemental affidavits and documents on March 29, 2005. (*See* Exhibit G, I, and L attached to Plaintiff's Statement of Material Facts).

15.   In its Required Disclosures Pursuant to Rule 26(a)(1), Defendant listed, as the only document in its possession that it may use to support its claims or defenses, the "collector notes" for the account allegedly owed by "Lisa Ross" (see, Exhibit D); the only document produced to Plaintiff as Defendant's "collector notes" is the one-page document attached hereto as Exhibit E.

**ANSWER:**   Admit. Answering further, Defendant supplemented the Rule 26(a)(1) disclosures with Responses to Plaintiff's First Set of Interrogatories on January

5

27, 2005 and supplemental affidavits and documents on March 29, 2005. (*See* Exhibit G,

I, and L attached to Plaintiff's Statement of Material Facts).

16.     On March 24, 2005, at the status hearing and the hearing in response to
Plaintiff's Motion to Compel, after counsel for Plaintiff told the Court that, "With
counsel's representation that there is no limitation here on their discovery response based
on the distinction of Delisa Ross, D-e-l-i-s-a, versus Lisa Ross, as far as what they are
producing to us, we can withdraw without prejudice our motion to compel.", counsel for
Defendant stated that: "That is correct your Honor. Everything has been turned over
regardless if it is Delisa or Lisa Ross." (See, transcript of March 24, 2005 hearing,
attached as Exhibit F at p. 12, lines 4, 13).

**ANSWER:**    Admit. Answering further, discovery did not close until August

31, 2005, and RJM supplemented the Rule 26(a)(1) disclosures supplemental affidavits

and documents on March 29, 2005, all of which were discussed with Plaintiff's counsel

on March 24, 2005. (*See* Exhibit G, I, and L attached to Plaintiff's Statement of Material

Facts).

17.     Defendant produced no documents in response to Plaintiff's document
production requests or interrogatories and either answered that it had no responsive
documents (as to Requests No.s 1, 2, 3, 4, 6, 7, 9 and 12) or objected to Plaintiff's
requests (as to Requests No. 5, 8, 10); as to Request No. 11, which requested all
documents that "refer to, relate to, or support or diminish any affirmative defense"
Defendant asserted, Defendant answered that it had engaged an outside company to
conduct a bankruptcy search on an account allegedly owed by Lisa Ross and that
investigation continues, but Defendant produced no documents responsive to this request.
(See attached Exhibit G).

**ANSWER:**    Deny. Answering further, RJM supplemented its response with an

Affidavit of Todd Feige of Phin Solutions and the Agreement by and between Federated

Department Stores and RJM to support its bona fide error defense before the discovery

cut off date in this matter. (*See* Exhibits I & L attached to Plaintiff' Statement of

Material Facts).

18.     The only documents that Defendant has produce relevant to either Lisa or Delisa Ross are the one-page "collector notes" attached hereto as Exhibit E and a single page that Defendant purports to be a "Fingerhut Statement For: Lisa Ross". (see attached Exhibit H).

**ANSWER:** Deny. RJM's "collector notes" are not the only relevant documents that RJM has produced in this lawsuit. Answering further, in addition to the collector notes and account statement, RJM has produced several document relevant to the Lisa Ross account, including but not limited to the following: (1) the Affidavit of Paul Brennan (Exhibit C to Plaintiff's Statement of Material Facts), (2) the Affidavit of Todd Feige (Exhibit I to Plaintiff's Statement of Material Facts); (3) the Asset Purchase Agreement (Exhibit L to Plaintiff's Statement of Material Facts); (4) the Affidavit of Scott Matte (Exhibit A to RJM's Motion for Summary Judgment); and (5) the Affidavit of Teresa Huxel.

19.     Defendant has produced an affidavit from one "Todd Feige" who identifies himself as the Executive Vice President and co-founder of Phin Solutions, Inc., a Minnesota corporation that, among other things, conduct bankruptcy searches for debt collectors. (Affidavit of Todd Feige, attached at Exhibit I at 2, 3, and 5).

**ANSWER:**     Admit.

20.     Mr. Feige testifies that it Phin Solutions does not log onto Pacer itself, but that it "uses a service (an independent company) that logs onto Pacer each week Tuesday through Saturday and downloads the information on the bankruptcy filings filed across the United States." (Exhibit I at 7).

**ANSWER:**     Admit.

21.     Mr. Feige testified the Phin Solutions was hired by RJM to conduct a bankruptcy search on a Lisa Ross, with the address of 305 East 77th Street, Chicago, IL 60619 and that Phin Solutions compared the "account information" provided by RJM to "Phin Solutions (sic) database", and that Phin Solutions". . . had no record of a Lisa Ross filing for bankruptcy as of October 4, 2004." (Exhibit I at 9, 10, 11).

**ANSWER:**     Admit.

22.     Neither Mr. Feige, nor Defendant RJM, has stated exactly, or provided
any other evidence of, what "account information" or search terms Defendant RJM
provided to Phin Solutions or what search terms Phin Solutions used to conduct its
bankruptcy searches. See Exhibit I and Exhibit G.

**ANSWER:**     Deny. Answering further, Mr. Feige's affidavit, which is attached

to Plaintiff's Statement of Material Facts as Exhibit I, shows precisely what "account

information" RJM provided to Phin solutions. Specifically, in paragraph 9 of his

affidavit Mr. Feige testifies "Phin Solutions was retained by RJM to conduct a

bankruptcy search on a *Lisa Ross, with the address of 305 East 77th Street, Chicago,*

*Illinois 60619.*" (Emphasis added.) In paragraph 10 of his affidavit Mr. Feige testifies

"Phin Solutions compared *the account information provided by RJM* to Phin Solutions

database of bankruptcies filed in the United States in the past seven (7) years." (Emphasis

added.) Obviously the "account information" RJM provided to Phin Solutions was the

name "Lisa Ross, with the address of 305 East 77th Street, Chicago, Illinois 60619."

23.     A Pacer search on the web site of the United States Bankruptcy Court for
the Northern District of Illinois shows that at least five individuals named "Lisa Ross"
have filed for bankruptcy since 1995 (N.D. Ill. Bankr. No. 03-07285; N.D. Ill. Bankr. No.
02-38662 ("Lisa Davis", but "Lisa Ross" is an alias); N.D. Ill. Bankr. No. 01-29512;
N.D. Ill. Bankr. No. 00-01684; and N.D. Ill. Bankr. No. 95-05253), and two of these
individuals listed a debt to Fingerhut in their bankruptcy petitions (No. 03-07285 and No.
02-38662). (See, attached Exhibit J).

**ANSWER:**     Admit. Answering further, such search does not reveal Plaintiff's

bankruptcy. (*See*, attached Exhibit 2).

24.     A search on the web site of the United States Bankruptcy Court for the
Northern District of Illinois using the first name "Lisa" and last name "Ross" produces
not only all of the individuals named "Lisa Ross" listed in paragraph 23, above, but also
Plaintiff Delisa Ross' bankruptcy. (See, attached Exhibit K).

**ANSWER:**     Deny. Answering further, a search on the United States

Bankruptcy Court for the Northern District of Illinois using the first name "Lisa" and last

name "Ross" does not produce Plaintiff Delisa Ross' bankruptcy. (*See*, attached Exhibit A). Moreover, Exhibit K attached to Plaintiff's Statement of Material Facts shows rules from using the first name "*lisa", not "Lisa." (*See* Exhibit K attached to Plaintiff's Statement of Material Facts).

25.     Defendant's entire bona fide error defense rests on its contention that the bankruptcy searches Defendant purportedly conducted, or had conducted on its behalf by a third party, could not have determined that Plaintiff Delisa Ross filed for bankruptcy s to this debt, because its records indicated that the debt was owed by "Lisa Ross". (See Exhibit G, Answers to Interrogatories at 6, 13, 14).

**ANSWER:**     Deny.  Answering further, RJM's bona fide error defense does not rest on its contention that RJM conducted a bankruptcy search on the account.  To the contrary, RJM's bona fie error defense rests on the fact that RJM had an agreement with the original creditor – FDS – that FDS would not sell RJM accounts in which the debtor had filed for bankruptcy. (*See* Exhibit L to Plaintiff's Statement of Material Facts; *see also* Matte Affidavit at ¶ 7).  Moreover, RJM had an agreement in place with FDS that FDS will apprise RJM of any potential claims regarding the accounts FDS sells to RJM. (*See* Exhibit L to Plaintiff's Statement of Material Facts; *see also* Matte Affidavit at ¶ 9). Third, RJM had a policy in place with its independent contractor, Plaza Associates, that Plaza would forward any notices of bankruptcy it receives on RJM accounts to RJM. (*See* Affidavit of Paul Brennan attached as Exhibit C to Plaintiff's Statement of Material Facts; *see also* Matte Affidavit at ¶ 10).  Finally, RJM has a policy in place to immediately cease all collections on accounts when apprised that a debtor has filed for bankruptcy. (*See* Matte Affidavit at ¶ 8).  The fact that RJM goes the next step and conducts an independent bankruptcy search on accounts is to prove the point that RJM

9

complies with what Plaintiff's counsel has argued was reasonable in order to invoke the

bona fide error defense under §1692k(c) of the FDCPA.

26.      The Asset Purchase Agreement, dated August 12, 2002, pursuant to which
Defendant purchase Plaintiff's account from the original creditor, Fingerhut, states that
Fingerhut believed that the statute of limitations may have run on most, if not all of the
receivables subject to the Agreement and that Defendant RJM acknowledged that
Fingerhut did not make any representations as to the accuracy or completeness of the
account information provided to Defendant RJM by Fingerhut. (See, Exhibit L at pp. 1,
5).

> **ANSWER:**      Admit.  Answering further, the Asset Purchase Agreement also

states:

> > . . . the Accounts will be sold (i) free and clear of all liens,
> > security interest claims or encumbrances . . .

> > and

> > . .. the Buyer and the Seller (i) recognize their respective
> > obligations not to attempt to collect or to collect debt
> > discharged in bankruptcy, (ii) have not and will not
> > intentionally attempt to collect or collect a debt that has
> > been discharged in bankruptcy, and (iii) acknowledge that
> > the Seller does not intend to transfer and the Buyer does not
> > intend to buy Accounts that have been discharged in
> > bankruptcy. . ."

> > and

> > . . . The parties will notify each other immediately of any
> > claim or threatened claim that may affect the Seller or the
> > Buyer or the other indemnified parties, that is discovered
> > by them. . .

(*See* Exhibit L attached to Plaintiff's Statement of Material Facts at pp. 2, 3, 9; *see also*

Matte Affidavit at ¶¶ 7 and 9).

WHEREFORE, Defendant, RJM Acquisitions Funding LLC, respectfully moves

this Court to deny Plaintiff's Motion for Summary Judgment and to grant such other

relief as this Court deems just.

Respectfully submitted,
RJM Acquisitions Funding LLC,

By: _Maria Whiteman_

One of its Attorneys

Joseph S. Messer
Maria L. Whiteman
Messer & Stilp. Ltd.
166 W. Washington, Suite 300
Chicago, Illinois 60602
312-334-FIRM (3476)
312-334-3434 (fax)

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Delisa Ross,                          )
                                      )
        Plaintiff,                    )
                                      )        Case No. 04 C 6557
        v.                            )
                                      )        Judge Gottschall
RJM Acquisitions Funding LLC, a       )
Delaware limited liability company,   )
                                      )
        Defendant.                    )

### AFFIDAVIT OF SCOTT MATTE

The undersigned, after being first duly sworn, certify that:

1.      This Affidavit is based on my personal knowledge and if sworn as a witness at the trial of this cause, I would and could competently testify as hereinafter stated.

2.      I am the President of RJM Acquisitions Funding LLC ("RJM") and have been so employed by RJM since its inception in 2001.

3.      RJM is a Delaware limited liability company that purchases delinquent charged-off consumer debt.

4.      In my position as President of RJM, I am familiar with the business practices and policies of RJM.

5.      RJM purchased from Federated Department Stores ("FDS") the account #17389064439, which listed Lisa Ross as the debtor who owed $574.72 on the account ("Account"). RJM purchased the Account from FDS pursuant to an Asset Purchase Agreement by and between RJM and Federated Department Stores ("FDS") dated August 12, 2002 (the "Asset Purchase Agreement"). The Asset Purchase Agreement was signed by me on or about August 12, 2002. The Asset Purchase Agreement is in substantially the same condition as it was when I signed it on August 12, 2002. A copy of the Asset Purchase Agreement is kept at RJM's place of business, and it is our practice to make and keep the Asset Purchase Agreement in the ordinary course of business. A copy of the Asset Purchase Agreement is attached hereto as Exhibit A.

6.      RJM has a five-part procedure in place to safe guard against undertaking collection activity on the accounts RJM has purchased from FDS, including the Account, which are subject to, or have been discharged in, a bankruptcy proceeding. RJM maintains this procedure to avoid violations of the bankruptcy code's automatic stay provision, as well as violations of the Fair Debt Collection Practices Act such as the violations alleged by the Plaintiff in the Complaint she filed in this lawsuit.



7. First, in paragraph 2(c) of the Asset Purchase Agreement RJM obtained FDS' acknowledgement of the parties' respective obligations not to attempt to collect debt that has been discharged in bankruptcy, as well as the acknowledgement and representation that FDS does not intend to transfer, and RJM does not intend to buy, accounts that have been discharged in bankruptcy.

8. Second, it is RJM's policy and business practice to immediately cease collection on any account when apprised that the debtor has filed for bankruptcy protection.

9. Third, in paragraph 9 of the Asset Purchase Agreement, FDS also agreed that it if it became aware of any claim or threatened claim that might affect RJM, FDS would immediately notify RJM of the claim.

10. Fourth, RJM had a long standing oral agreement in place with Plaza Associates, a third party debt collector that RJM used to collect accounts, including the Account, that Plaza Associates would apprise RJM of any bankruptcy notices that it received on accounts RJM placed for collection with Plaza Associates.

11. Fifth, RJM conducts bankruptcy checks through Phin Solutions, a third party vendor, on all the accounts RJM attempts to collect. RJM placed the Account with Phin Solutions for a bankruptcy search before this lawsuit was filed.

12. RJM did not receive notice of any bankruptcy proceeding regarding the Account until the time RJM received a telephone call from Plaintiff's bankruptcy attorney in October 2002. Further, the Complaint contains exhibits from Plaintiff's bankruptcy proceeding indicating that "Delisa" Ross, as opposed to "Lisa" Ross, discharged the Account in bankruptcy. Moreover, RJM as a creditor on Schedule F of Plaintiff's bankruptcy petition, however, RMA Acquisitions is listed on Schedule F of Plaintiff's bankruptcy petition. Similarly, the original creditor for the Account was improperly listed on Schedule F of Plaintiff's bankruptcy petition as follows: Fingerhut Credit Advantage, c/o Axsys National Bank, P.O. Box 5033, Sioux Falls, SD 57117-5033. However, Axsys National Group did not service the Account.

13. During the course of the litigation in this lawsuit RJM produced its collector notes to the Plaintiff.

14. "Collector notes" is a term used to describe the field in RJM's collection software system where RJM's collectors document all the activity that has occurred on a particular account. RJM utilizes a collector notes field to keep track of, among other things, all letters sent to or received from debtors and telephone calls received from or made to debtors. RJM collectors are required to make notations in the collector notes field of any communication, written or oral, with a debtor or anyone acting on behalf of a debtor such as an attorney.

15.     The collector notes are generated by electronic equipment using an in-house developed software, which produces an accurate record of the activity on the Account. The entries in the collector notes for the Account were made in the regular course of RJM's business at or reasonably near the time of the events recorded in the collector notes by RJM collectors possessing personal knowledge of the recorded events. A copy of the collector notes is kept at RJM's place of business, and it is our practice to make and keep these statements in electronic format. To produce the collector notes in a paper format it is necessary to print the computer screen image of that field. A copy of the computer screen image of the collector notes for the Account is attached as Exhibit B.

16.     The October 4, 2002 entry on the collector notes for the Account shows that, as one of the first actions RJM took with respect to the Account, RJM caused a bankruptcy search to be conducted on the Account. The collector notes also show that RJM did not receive notice of a bankruptcy affecting the Account until October 7, 2002, which was when RJM was contacted by Plaintiff's bankruptcy attorney.

17.     I was also the Senior Vice President for Plaza Associates for ten (10) years prior to April 2004.

18.     As the Senior Vice President, I was familiar with the business practices and policies of Plaza Associates.

19.     Plaza Associates is a New York company that collects debts on behalf of third-party creditors, such as RJM.

20.     Plaza Associates was retained by RJM in September 2002 to collect on the Account.

21.     Based on my review of Plaza Associates' and RJM's records pertaining to the Account, I know that Plaza Associates attempted to collect the Account from Lisa Ross from September 2002 through October 2003, and that October 2, 2003, Plaza Associates closed its file on the Account and returned the file electronically to RJM.

22.     It was the business practice of Plaza Associates to forward any bankruptcy notices it receives on an account it was attempting to collect for RJM and any other creditor. If Plaza Associates received a bankruptcy notice that its employees knew pertained to the Account during the time Plaza was collecting on the Account, pursuant to this business practice it would have forwarded the bankruptcy notice to RJM.

23.     Based on my review RJM's records pertaining to the Account I know that RJM did not receive any bankruptcy notices from Plaza Associates pertaining to the Account.

24.     RJM is not in the business of collecting debts that have been discharged in bankruptcy.

FURTHER, AFFIANT SAYETH NOT.

Dated: _8/22/05_

_____ Signed and subscribed
Before me this _22nd_
Day of _August_, 2005

_____ Notary

**EILEEN T. KEEGAN**
**Notary Public, State of New York**
**No. 5011441**
**Qualified in Nassau County**
**Commission Expires April 19, 20 _07_**

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made as of August 12, 2002 by and among Fingerhut Companies, Inc., a Minnesota corporation ("Seller"), Federated Department Stores, Inc., a Delaware corporation ("Guarantor") and RJM Acquisitions Funding LLC, a Delaware limited liability company (the "Buyer").

WHEREAS, the Seller desires to sell and the Buyer desires to purchase certain charged-off and certain pre-charged-off closed end installment sale contract accounts receivable originated and owned by Seller on the terms and conditions contained herein; and

WHEREAS, the Seller believes, but has not verified, that the statute of limitations may have run on most, if not all of the receivables subject to this Agreement;

NOW THEREFORE, the Seller and the Buyer agree to the following:

1.  Definitions

(a)  "Accounts" means approximately .           in current outstanding principal balance of those certain charged off (the "Charge-Off's"), and approximately          in current outstanding principal balance of those certain pre-charged-off (the "A/R's"), closed-end installment sale contracts that are being sold pursuant to this Agreement and which will be listed in electronic format in an attachment to the Bill of Sale and which were previously presented by Seller to Buyer in the due diligence tapes in July of 2002.

(b)  "Account Balance" means, in the case of the Charge-Off's, the balance due as of the date of charge-off by the Seller, adjusted for any credits or debits subsequent to charge-off and through the applicable Cut-Off Date, or in the case of the A/R's, the current outstanding principal balance as of the applicable Cut-Off Date.

(c)  "Account Information" means the information contained in the attachments to the Bill of Sale and will include all of the information in Seller's possession related to the Accounts, including but not limited to the information set forth in Exhibit B hereto.

(d)  "Cut-Off Date" means, with respect to the Charge-Off's, July 10th, 2002, and with respect to the A/R's, June 28, 2002.

(e)  "Obligor" means the person or persons obligated to make payment on an Account.

(f)  "Purchase Price" means the amount specified in Section 2(b) below.

(g)  "Transfer Date" means August 16th, 2002, or such date thereafter that is mutually acceptable to Buyer and Seller.

EXHIBIT A

2.    Purchase and Sale of Accounts; Payment and Transfer

(a)    Purchase and Sale.    On the terms and subject to the conditions of this Agreement, the Seller agrees to sell, transfer, convey and deliver to the Buyer and the Buyer agrees to purchase and accept from the Seller, on and as of the Transfer Date, all right, title and interest of the Seller in and to the Accounts.    Except as specifically provided in this Agreement, the Accounts will be sold (i) free and clear of all liens, security interests, claims or encumbrances and (ii) without recourse to the Seller or its affiliates and without warranty of any kind (including, without limitation, warranties pertaining to collectability, enforceability or documentation).    The Buyer acknowledges that some Accounts, or certain transactions posted to some Accounts, may be subject to actual or potential claims or disputes by Obligors against the Seller or its affiliates. The Buyer purchases those Accounts expressly subject to any rights of Obligors, and will not assert those claims, disputes, and rights against the Seller or Seller's affiliates.    Notwithstanding the foregoing sale, Seller shall retain all of the data regarding the Accounts and the Obligors in its database currently in Seller's possession for a minimum period of five years, and shall retain the right to use or license such data for any purposes it may, in its sole discretion, determine, as long as such purposes are not in conflict with Buyer's ownership and collection of the Accounts.

(b)    Purchase Price; Payment.    The total purchase price to be paid to the Seller for the Accounts (the "Purchase Price") shall be                                                  based on an estimated Account Balance of approximately $                    Account Balance of Charge-Off's, and approximately                    Account Balance of A/R's.    The Purchase Price shall be payable by immediately available wire-transferred funds no later than 3:00 PM (Minnesota time) on the Transfer Date.

(c)    Post-Closing Payments on Accounts.    The Buyer shall be entitled to all principal, interest and fees collected on the Accounts from and after the Cut-Off Date.    Accordingly, Seller shall hold any such amounts in trust for Buyer and shall either forward such amounts directly to Buyer or remit to the Buyer within 21 business days of receipt (but not less frequently than monthly) an amount equal to the amount of any such payments received by the Seller on or after the Cut-Off Date.    The Seller shall mark its records and data bases to reflect that the Accounts have been transferred to the Buyer and shall refer all inquiries from Obligors to Seller or its agents or representatives to Buyer's toll-free number indicated on Exhibit D.

(d)    Bill of Sale.    On the Transfer Date, subject to satisfaction or waiver of conditions in this Agreement, the Seller will execute and deliver to the Buyer a Bill of Sale (with the Account Information provided in electronic attachments).    The Bill of Sale will be substantially in the form attached hereto as Exhibit A.

(e)    Accounts Sold "As Is".    Except as specifically provided in this Agreement, all documentation, information, analysis, and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to the Buyer with respect to any of the Accounts are done so on an "as is, where is" basis, with all faults.    Except as provided for in this Agreement, the Buyer acknowledges and agrees that the Seller has not represented, warranted or covenanted the number, nature, accuracy, completeness, enforceability or validity of any of the Accounts or the Account Information, and nothing in this Agreement shall be deemed to be any such

2

representation, warranty or covenant. Notwithstanding the foregoing, the Buyer and the Seller (i) recognize their respective obligations not to attempt to collect or to collect debt that has been discharged in bankruptcy, (ii) have not and will not intentionally attempt to collect or collect debt that has been discharged in bankruptcy, and (iii) acknowledge that the Seller does not intend to transfer and the Buyer does not intend to buy Accounts that have been discharged in bankruptcy.

(f)      Not a Sale of Securities.  The Buyer and the Seller agree and acknowledge that the sale of Accounts documented by this Agreement is not a sale of securities.

3.      Conditions Precedent to Purchase and Sale of Accounts.  Unless waived in writing by the parties hereto, the obligations of the parties are subject to the satisfaction on or prior to the Transfer Date of the following conditions precedent.

(a)      Representations and Warranties.  The representations and warranties of the Buyer and the Seller in this Agreement will be true and correct as of the Transfer Date.

(b)      Compliance with Covenants and Agreements.  The Buyer and the Seller will each have complied in all material respects with each of their respective covenants and agreements in this Agreement on or before the Transfer Date.

(c)      Buyer's Credit Reference.  At the Seller's request, the Buyer will have delivered to the Seller one or more letters of reference as to the Buyer's business reputation or creditworthiness that is satisfactory to the Seller.

(d)      No Violation of Law.  Consummation by the Buyer and the Seller of the transaction contemplated by this Agreement and performance of this Agreement will not violate any order of any court or governmental body having competent jurisdiction or any law or regulation that applies to the Buyer or the Seller.

(e)      Approvals Consents and Notices.  All required approvals, consents, and other actions by, and notices to and filings with, any governmental or regulatory authority, and any other person or entity will have been obtained or made.

(f)      Payment.  The obligation of the Seller to transfer the Accounts to the Buyer is subject to the receipt, on or before the Transfer Date by the Seller, of the Purchase Price.

4.   _The Seller's Representations and Warranties_.  Seller represents and warrants as to itself that as of the Transfer Date:

(a)   _Due Organization, Authorization, and No Conflict_.  Seller is duly organized, existing and in good standing as a corporation under the laws of its state of incorporation.  The execution, delivery and performance of this Agreement by the Seller are within its corporate or legal powers; have been duly authorized by all necessary corporate or other similar action; and will not violate, breach or result in the creation of a lien on the Accounts under (i) any law or regulation applicable to Seller, (ii) the terms of Seller's articles or certificate of incorporation or bylaws, or (iii) any material indenture, agreement or undertaking by which Seller is bound.

(b)   _Title to the Accounts_.  Seller has good and marketable title to the Accounts being sold by it, free and clear of all liens, charges, encumbrances or rights of any third party collection agencies previously utilized by the Seller or its affiliates.

(c)   _Accounts_.  The listing of Accounts to be delivered to the Buyer in Exhibit A to the Bill of Sale will be true and correct as of Cut-Off Date and, to the best knowledge of Seller, will represent the unpaid balance as of the Cut-Off Date of a closed-end installment sale relating to merchandise or services provided by Seller.  Except as provided for in the immediately preceding sentence, the Seller has not made any representation, nor makes any current representation, with respect to (i) the completeness or accuracy of any Account Information relating to an Account or (ii) the collectability of the Accounts.  The Seller believes, but has not verified, that the statute of limitations may have run on most, if not all, of the Accounts.  Except as provided in this Section 4, the Seller makes no other representations or warranties, express or implied, with respect to any of the Accounts.

(d)   _Seller solvency_.  The transfer of the Accounts by the Seller to the Buyer is not being made by the Seller with an intent to delay, defraud or hinder creditors of the Seller.  In addition, the Seller has been financially solvent prior to and will continue to be immediately following the transfer of the Accounts by the Seller to the Buyer.

(e) _Origination and Servicing_.  All of the Accounts were originated and serviced by the Seller and its agents and representatives, including all of its collection agencies, in accordance will all applicable laws through the Transfer Date.

4

5.     Representations and Warranties of the Buyer.  The Buyer represents and warrants that as of the date hereof and the Transfer Date:

(a)     Due Organization, Authorization, and No Conflict.

     (i)     The Buyer is duly organized, existing and in good standing as a limited liability company under the laws of the State of Delaware.

     (ii)     The Buyer's execution, delivery and performance of this Agreement are within the Buyer's corporate or legal powers; have been duly authorized by all necessary corporate or other similar action; and will not violate or breach (A) any law or regulation applicable to the Buyer, (B) the terms of the Buyer's organizational documents, articles of incorporation, charter or bylaws, or (C) any material indenture, agreement or undertaking by which the Buyer is bound.

     (iii)     The Buyer's review of Account and Obligor information will not represent a conflict of interest on the part of the Buyer or the Buyer's officers or employees, and neither the Buyer nor any of the Buyer's affiliated companies is presently a party to any litigation, or involved in any litigation, with the Seller or any of their affiliates.

(b)     Investigation of Accounts.  The Buyer warrants and represents that it is a sophisticated and experienced investor, has knowledge and experience regarding the purchase of charged-off debt, collection of charged-off debt, including debt that is outside the applicable statute of limitations, and business matters that enable it to evaluate the merits and risks of the purchase of the Accounts contemplated by this Agreement.  Except as specifically provided in this Agreement, the Buyer acknowledges that the Seller does not represent, warrant, or ensure the accuracy or completeness of any information or its source of information provided to the Buyer or in any of the Account Information.  The Buyer agrees and represents that the information made available to it with respect to the Accounts was an adequate and sufficient basis on which to determine whether and at what price to purchase the Accounts.  The Buyer has made such inventory, review and independent investigation as it deems to be warranted into the number, nature, validity, enforceability, collectability, completeness and value of the Accounts and Account Information, and all other facts it deems material to its purchase and is entering into this Agreement solely on the basis of that investigation and the Buyer's own judgment, and is not acting in reliance on any representation made or information furnished by the Seller, its employees, agents, representatives, or independent contractors except for the representations and warranties provided in this Agreement.

(c)     Statute of Limitations.  The Buyer acknowledges that any information provided to the Buyer that related to a statute of limitations was for the Buyer's convenience only, was not a representation by the Seller and that the Buyer did not rely upon that information.  The Buyer will make its own determination concerning statute of limitations issues.

(d)     Brokers.  No finder, broker, agent, financial advisor or other intermediary has acted on behalf of the Buyer in connection with the negotiation or consummation of this Agreement or the transaction contemplated in this Agreement and no such person or entity is

entitled to any payment, commission or other consideration in connection therewith as a result of any arrangement made by the Buyer.

6.    Conduct of Business After the Transfer Date

(a)    Notice to Obligors.  The Buyer shall not discredit or impugn the reputation of the Seller in any written or oral communication between the Buyer and any Obligor.  The Buyer agrees not to provide the Seller's mailing address, phone number or email address to any Obligor, except for providing the phone number for the purposes of establishing the origination of the Account.

(b)    No Action Inconsistent With Sale.  The Seller, on and after the Transfer Date, will not take any action with respect to any Account that is inconsistent with the sale of such Account to the Buyer; including, but not limited to, withholding, offsetting or accepting and retaining any Obligor payment; compromising, reinstating, adjusting balances; or transferring balances to other Accounts or obligations.  At Buyer's reasonable request (based upon a request from the related Obligor), the Seller will from time to time provide Buyer with a signed letter (in the form shown in Exhibit D) which acknowledges that certain of the Accounts have been sold from the Seller to the Buyer.

(c)    Debt Collection of Accounts.  Privacy.  If the Buyer collects or attempts to collect on an Account, the Buyer (and its successors and assigns) or the Buyer's agent will not make any false or misleading statements or representations to any Obligor nor will the Buyer use any means or method of collection that could reasonably be construed as unfair or unconscionable or take any other enforcement action against any Obligor that would violate applicable law.  Without limiting the foregoing, the Buyer (and its successors and assigns) and the Buyer's agents will at all times:

(i)    Comply with all federal, state, and local laws, regulations, or other legal requirements applicable to debt collection and privacy including, but not limited to, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act and the Gramm-Leach-Bliley Act to the extent applicable to Buyer.

(ii)    For any Account on which the statute of limitations has run, not falsely represent that a lawsuit will be filed if the Obligor does not pay; and

(iii)    Refrain from instituting any enforcement or legal action or proceeding in the name of the Seller, or any affiliate thereof, or make reference to the Seller or any affiliate in any correspondence to or discussion with any individual Obligor or any other person or entity regarding enforcement or collection of the Accounts except to identify the origination of the Account.  The Buyer will refrain from any misleading or deceiving statement to any individual borrower regarding the identity of the Buyer as the owner of the Accounts.

7.   Use of Seller's Name

(a)   Except to identify the origination of the Account, the Buyer will not use or refer to the name of the Seller, or any affiliate, successor or predecessor thereof, any trademark or trade name of the Seller or any affiliate thereof, or any similar name for any mass advertising regarding the Accounts and will not portray itself as the agent, partner or joint venturer of the Seller or any of its affiliates with respect to the Accounts, nor state or represent in any way that it is acting on behalf of the Seller or any entity related to the Seller.  In contacting an Obligor, filing suit, or selling accounts, the Buyer will not state or represent in any way that the Buyer is contacting the Obligor, filing suit or selling accounts for or on behalf of the Seller or any affiliate of the Seller.

(b)   The Buyer and the Seller acknowledge that the Buyer's breach of Section 7(a) may result in actual and substantial damages to the Seller, the amount of which could be difficult to ascertain with precision.  Therefore, if the Buyer breaches Section 7(a) and the Buyer is unable to cure such breach to the Seller's reasonable satisfaction, the Buyer will pay to the Seller as liquidated damages, the sum of fifty thousand dollars ($50,000) for each actual, documented, non-inadvertent breach (each breach being the single use of any of the above names, communicated to a third party in the promotion, marketing, advertising, sale or transfer of any Account) in addition to the fees and expenses that the Seller may incur in recovering those liquidated damages and in preventing the Buyer's further breach of this provision.

8.   Indemnity.

(a)   The Buyer will indemnify, defend and hold harmless the Seller, and its parent corporations, subsidiaries, affiliates, directors, officers, employees, agents, and representatives (each an "indemnified party"), from and against all claims, damages, losses, costs, liability and expenses (including, without limitation, attorneys' fees, experts' fees and cost of suits) that it might suffer, incur or be subjected to for any reason, directly or indirectly, related to or arising from x) any breach by the Buyer or its parent LLC, subsidiaries, affiliates, directors, officers, employees, agents, representatives, successors or assigns of any representation, warranty or covenant contained in this Agreement or y) any illegal acts or omissions or alleged illegal acts or omissions of the Buyer or the Buyer's parent LLC, subsidiaries, affiliates, directors, officers, employees, agents, representatives, successors or assigns with respect to the Accounts after the Transfer Date..  The Buyer shall bear all expenses in connection with the defense and/or settlement of any such claim or suit.  The Seller shall have the right, at its own expense, to participate in the defense of any claim or suit against which they are indemnified and which has been assumed by the Buyer pursuant to this section.  The Buyer, in the defense of any such claim or suit, except with the written consent of the related indemnified party, shall not consent to entry of any judgment or enter into any settlement that either (i) does not include, as an unconditional term, the grant by the claimant to such indemnified party of a release of all liabilities in respect to such claims, or (ii) otherwise adversely affects the rights of such indemnified party.

At all times that the Buyer owns or handles the Accounts, the Buyer will maintain standard commercial general liability insurance, including coverage for personal injury and property damage, with a liability limit of not less that $2,000,000, which also covers the Buyer's indemnification obligation under this Agreement.

7

(b)    The Seller will indemnify, defend and hold harmless the Buyer, and its parent LLC, subsidiaries, affiliates, directors, officers, employees, agents, and representatives (each an "indemnified party"), from and against all claims, damages, losses, costs, liability and expenses (including, without limitation, attorneys' fees, experts' fees and cost of suits) that it might suffer, incur or be subjected to for any reason, directly or indirectly, related to or arising from x) any breach by the Seller or its parent corporations, subsidiaries, affiliates, directors, officers, employees, agents, successors or assigns of any representation, warranty or covenant of Seller contained in this Agreement or y) any illegal acts or omissions or alleged illegal acts or omissions of the Seller or the Seller's parent corporations, subsidiaries, affiliates, directors, officers, employees, agents or representatives, successors or assigns with respect to the Accounts prior to the Transfer Date.  The Seller shall bear all expenses in connection with the defense and/or settlement of any such claim or suit.  The Buyer shall have the right, at its own expense, to participate in the defense of any claim or suit against which they are indemnified and which has been assumed by the Seller pursuant to this section.  The Seller, in the defense of any such claim or suit, except with the written consent of the related indemnified party, shall not consent to entry of any judgment or enter into any settlement that either (i) does not include, as an unconditional term, the grant by the claimant to such indemnified party of a release of all liabilities in respect to such claims, or (ii) otherwise adversely affects the rights of such indemnified party.  Buyer agrees and acknowledges that the Seller shall be responsible for indemnifying the Buyer pursuant to this Section 8(b) to the extent any applicable claims, damages, losses, costs, liability and expenses (including, without limitation, attorneys' fees, experts' fees and cost of suits), in the aggregate, exceed $100,000.

(c)    In the event of breaches of Section 4(c) of this Agreement due to Accounts having been settled in full prior to the Cut-Off Date, the indemnity obligation of the Seller in Section 8(b) above shall be limited as follows:  the indemnity obligation of the Seller pursuant to Section 4(c) above shall only apply to the extent that such indemnity obligation relates to more than five percent (5%) of the number of Accounts sold under this Agreement.  Further, the indemnity obligation of the Seller in respect of such breaches shall be limited to the allocated purchase price for such related Accounts, based upon the Purchase Price paid hereunder for the related Account Balances.

(d)    Indemnity Guarantee.  x) The Guarantor hereby unconditionally and irrevocably guarantees the Seller's obligations under this Section 8.  The Guarantor agrees and acknowledges that this guarantee is an absolute, unconditional and continuing guaranty of payment and performance by the Seller of the Seller's obligations under this Section 8, except as limited by Section 8(e). The Guarantor hereby waives presentment, demand for payment, notice of dishonor or nonpayment and protest of Seller's obligations under this Section 8.  The Buyer shall not have to make a separate demand upon the Seller, nor be required to resort for payment from Seller, in order to enforce this guarantee.

y) The Guarantor is duly organized, existing and in good standing as a corporation under the laws of its state of incorporation.  The execution, delivery and performance of this Agreement by the Guarantor are within its corporate or legal powers; have been duly authorized by all necessary corporate or other similar action; and will not violate, breach or result in the

8

creation of a lien on the Accounts or the Seller under (i) any law or regulation applicable to Guarantor, (ii) the terms of Guarantor's articles or certificate of incorporation or bylaws, or (iii) any material indenture, agreement or undertaking by which Guarantor is bound

(c)     The provisions of this Section 8 shall survive the termination or expiration of this Agreement, except that Seller's indemnity obligation will end 3 years after the Transfer Date.

9.     Notice of Claims.  The parties will notify each other immediately of any claim or threatened claim that may affect the Seller or the Buyer or the other indemnified parties, that is discovered by them.

10.     Confidentiality.  The Buyer's use and possession of any confidential information shall be governed by the Confidentiality Agreement between the Buyer and the Seller, executed in connection with Buyer's review of Seller's due diligence tape for the Accounts.  In addition, the Purchase Price for the Accounts shall not be disclosed directly or indirectly by the Seller or the Buyer to any third party, except for advisors or existing financing counterparties of Seller or Buyer who are also subject to a confidentiality obligation.  The Seller or the Buyer may issue a press release in regard to the transaction contemplated in this Agreement, but only upon the written consent of both the Seller and the Buyer.

11.     Credit Reports.  Buyer has the option of reporting the Accounts to Consumer Reporting Agencies in such manner as is determined in Buyer's sole discretion.

12.     Miscellaneous Terms

(a)     Notices.  All notices or other communication required to be given pursuant to this Agreement shall be effective when received and shall be sufficient if given in writing, by telecopy, hand delivered, registered or certified United States mail, return receipt requested, or overnight air courier, and delivered to the other party at its address set forth next to its signature to this Agreement unless otherwise expressly provided in this Agreement.  The parties hereto may at any time change the name and address of persons to whom must be sent all notices or other documents required to be given under this Agreement by giving notice to the other parties.

(b)     Successors and Assigns.  Buyer may sell, transfer or assign any or all of the Accounts without obtaining the prior consent of the Seller.  Neither the Buyer nor the Seller may assign their rights or remedies under this Agreement without the other party's prior written consent.  This Agreement will bind and inure to the benefit of the Buyer and the Seller and their respective successors and assigns.  Any assignment by either party of this Agreement or any of either party's rights under this Agreement without the other party's prior written consent shall be void.  If the Buyer subsequently sells, transfers or assigns the Accounts to a third party, the Buyer agrees that all communications from any such assignees or purchasers to the Seller shall be made through the Buyer.

(c)     Expenses.  Each party shall pay all of the costs and expenses incurred by it in negotiating and preparing this Agreement (and all other agreements, certificates, instruments and

documents executed in connection herewith), in performing its obligations under this Agreement, and in otherwise consummating the transactions contemplated by this Agreement, including without limitation its attorneys' fees and accountants' fees.

(d)     Entire Agreement. This Agreement, including the exhibits hereto, embodies the entire Agreement and understanding between the parties and supersedes all prior agreements and understanding relating to the subject matter of this Agreement with the exception of the Confidentiality Agreement referenced in Section 10 above. The parties make no representations or warranties to each other, except as contained in this Agreement or in the accompanying exhibits or the certificates or other closing documents delivered according to this Agreement.

(e)     Amendment. Neither this Agreement nor any of its provisions may be changed, waived, discharged or terminated orally. Any change, waiver, discharge or termination may be effected only by a writing signed by all the parties hereto.

(f)     Governing Law; Severability. THIS AGREEMENT SHALL BE GOVERNED BY, AND ITS TERMS AND PROVISIONS CONSTRUED IN ACCORDANCE WITH, THE LAW AND DECISIONS OF THE STATE OF NEW YORK (BUT WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES). If any one or more of the provisions of this Agreement, for any reason, is held to be invalid, illegal or unenforceable, the invalidity, legality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

(g)     Further Assurances. The parties shall, on and after the Transfer Date, cooperate with each other, deliver such other documents and things, if any, and do such other acts, if any, as are necessary to fully carry out the transaction contemplated by this Agreement, including but not limited to the Seller's execution and delivery of such assignments and/or financing statements as Buyer may reasonably request.

(h)     Waiver of Jury Trial. If any party brings any action against another party, whether at law or equity, regarding the other party's performance under this Agreement or brings any action connected in any way with this Agreement, the parties agree to waive trial by jury.

(i)     Waiver. No failure of any party to take any action or assert any right hereunder shall be deemed a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

(j)     Headings. Headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

(k)     Counterparts. This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.

(l)     Agency Agreements. Seller is hereby deemed to assign all of rights Seller has under any contracts existing between it and any collection agency servicing the Accounts as of the Cut-Off Date. Seller shall provide each such collection agency with written notice of the transfer of the Accounts pursuant to this Agreement and shall cooperate fully with Buyer to effect the

written assignment of Seller's rights under any such agreements, to the extent reasonably requested by Buyer.

(m)   Power of Attorney.   Seller hereby grants Buyer and any officer of Buyer full power of substitution, as Seller's true and lawful attorney-in-fact, with power, in Buyer's own name, to execute, endorse, deposit and/or otherwise negotiate any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under or in respect of any policy of insurance), or any other forms of payment in respect of the Accounts that come into the possession of the Buyer.   This power of attorney shall be irrevocable for as long as any Accounts remain outstanding.

*[Signature page to follow]*

M1:672133.11

11

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

Fingerhut Companies, Inc.
4400 Baker Road
Minnetonka, MN 55343
Attn: Bob Kieffer
Fax: (952) 932-3181

FINGERHUT COMPANIES, INC.

By: _____
Title: Vice President


RJM Acquisitions Funding LLC
575 Underhill Boulevard
Suite 224
Syosset, New York 11791
Attn: Scott D. Matte
Fax: (516) 714 - 1310

RJM ACQUISITIONS FUNDING LLC
(the "Buyer")

By: Scott D. Matte
Title: President


Federated Department Stores, Inc. ("Guarantor")

7 West 7th Street
Cincinnati, Ohio 45202
Attn: General Counsel
Fax:
Title:

FEDERATED DEPARTMENT STORES,
INC. (the "Guarantor")

By: Neal J. Glueck
Title: Vice President & Assistant Secretary


M1:672133.11

```
RJM STAFF HANDLING(EE5)-(800) 541-0824           09092002
MAIN H/A VERIFIED THROUGH NCOA                   09112002
ACCT INPUTTED FOR BANKRUPTCY WATCH               10042002
ACCT REPORTED TO TRANSUNION/EXPERIAN             10132002
AUTOMATED COLLECTION DUN PROCESS "ADS"           03062003
DUNNING LETTER AXI SENT 50%= $237.36     PLY     03062003
DUNNING LETTER ADC SENT          PLY             05052003
MANAGEMENT REVIEWING ENTIRE FILE                 08042003
ACCT CLOSED...ELIGIBLE FOR REOPEN                10022003
ASSIGNED TO RJM(EE4)-(800)-541-0824              03042004
REFER TO RJM(EE1)-(800)-541-0824                 03042004
PZI/0000459.78                                   03042004
LTR RJMPP3 SENT (1)                              04262004
## LTR RJMPDD SENT (1)                           06152004
## LTR RJMPGS SENT (1) FLEETWOOD COLLECTION      08032004
IC FROM ALICE FROM LAW OFFICE OF STUART B HANDELMA 10062004
N (312) 360-0500 X 10                            10062004
FU FOR FAX                                       10062004
FAX SIGNED AUTH FOR DELISA ROSS FROM LAW OFF STUAR 10072004
T B HANDELMAN                                    10072004
***CORRECTION. ATTY LTR FOR CEASE AND DESIST.    10072004
IC FROM ALICE OF ATTY OFFICE, CLAIMS D IS BEING CO 10072004
NTACTED BY US.                                   10072004
D FILED BKY AND ALICE WILL FAX OVER INFO         10072004
TOLD ALICE NO ONE FROM THIS OFFICE SPOKE WITH D  10072004
Stop dunn chg on acct w/NOT status flag(10).     10082004
RJM CORRO RCVD#                                  10082004
THIS IS OLD..LEAVE IT ALONE                      10082004
```


EXHIBIT B

## Select A Person

**There were 9 matching persons.**

| | |
|---|---|
| Ross, Lisa | (pty) |
| Ross, Lisa | (pty) |
| Ross, Lisa | (pty) |
| Ross, Lisa L | (pty) |
| Ross, Lisa Sharmae | (pty) |
| Ross, Lisa Y | (pty) |
| Rossey, Lisa J | (pty) |
| Rossi, Lisa | (pty) |
| Rossi, Lisa M | (pty) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/25/2005 14:35:33 | | | |
| **PACER Login:** | ms0861 | **Client Code:** | RJM/Ross |
| **Description:** | Search | **Search Criteria:** | LName: Ross FName: Lisa |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |



EXHIBIT
2